UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
**Beaumont Division**

FILED - CLERK
U.S. DISTRICT COURT

2005 SEP -6  PM 4: 29

TX EASTERN-BEAUMONT

BY *Odele McMillan*

GULF PETRO TRADING COMPANY, INC.; )
PETREC INTERNATIONAL, INC.; )
JAMES S. FAULK; and JAMES W. FAULK )
 )
*Plaintiffs* )
 )
 ) CASE NO.: 1 : 05 C V 0 6 1 9
 ) 05 Civ. _____ - _____
v. )
 ) **Judge Cobb**
NIGERIAN NATIONAL PETROLEUM )
CORPORATION; BOLA AJIBOLA; ) **COMPLAINT**
JACKSON GAIUS-OBASEKI; )
SENA ANTHONY; ANDREW W.A. BERKELEY; )
IAN MEAKIN; HANS VAN HOUTTE; ) **JURY TRIAL DEMANDED**
and ROBERT CLARKE )
 )
*Defendants.* )
 )
 )

Plaintiffs, Gulf Petro Trading Company ("Petrec"), Petrec International, Inc., James S.

Faulk, and James W. Faulk, by their attorneys, for its Complaint against Defendants, Nigerian

National Petroleum Corporation ("NNPC"), Bola Ajibola, Jackson Gaius-Obaseki, Sena

Anthony, Andrew Berkeley, Ian Meakin, Hans van Houtte, and Robert Clarke alleges on

knowledge with respect themselves and their own conduct, and upon basis of information and

belief as to all other matters. Within the strictures of Fed. R. Civ. P. 9(b), Plaintiffs' information

and belief are based, among other things, on documents and communications generated by

Defendants which reveal their knowing participation in the fraudulent scheme detailed later in

this Complaint. Although many documents and communications were destroyed by Defendants

and others during the course of the scheme, Plaintiffs believe that discovery from the Defendants will reveal additional material that further supports Plaintiffs' claims.

## NATURE OF THE ACTION

1.    This action arises out of a scheme perpetrated by the Defendants to suborn the corruption and bribery of an international commercial arbitration, to which Plaintiff, Gulf Petro Trading Company ("Petrec"), doing business through its wholly-owned division, Petrec International, Inc., was a party. The underlying commercial dispute between Petrec and the Nigerian National Petroleum Corporation ("NNPC") concerned a December 17, 1992 Memorandum of Understanding, followed by a fully-articulated June 10, 1993 Joint Venture Agreement (JVA) for Petrec to undertake oil reclamation activities in Nigeria, through an entity known as Petrec (Nigeria), Ltd., on behalf of NNPC. This JVA was in addition to another JVA concluded between Petrec and NNPC for the refining of oil and a JVA concluded between the parties for Petrec to construct for Nigeria a urea fertilizer plant.

2.    Almost as soon as the ink had dried on the June 10, 1993 oil reclamation JVA, Nigeria began to renege on the contract. Even after Petrec had spent in excess of U.S.$4 million (hereinafter in this Complaint, all monetary figures will be rendered in U.S. dollars, unless otherwise indicated) in monetary and equipment outlays to satisfy its part of the bargain in mobilizing oil reclamation resources to Nigeria, NNPC refused to make the necessary progress payments to the joint venture company, Petrec (Nigeria), Ltd. account in Nigeria or the Petrec (Nigeria), Ltd. bank accounts in the United States, as required by the JVA. After years of fruitless negotiations by Petrec with NNPC to have NNPC resume its obligations under the JVA,

Petrec informed NNPC in August 1998 that it was in breach of the JVA and that Petrec would initiate an international commercial arbitration, as called for under the JVA.

3. Under the oil reclamation JVA of June 10, 1993, arbitration was to be conducted under the auspices of the Chamber of Commerce and Industry of Geneva, Switzerland (hereinafter "CCIG"). Arbitrators were appointed to the tribunal – including Andrew Berkeley (a London attorney, who was Petrec's party-appointed arbitrator), Ian Meakin (a British attorney, based in Switzerland, who was appointed by CCIG as an arbitrator on behalf of NNPC), and Professor Hans van Houtte (a Belgian law professor, who was jointly-appointed to preside over the arbitration) – each of whom certified that they had no conflicts of interest in the matter or any prior associations with the parties. For at least one of the arbitrators, Mr. Andrew Berkeley, this was later found to be untrue: Mr. Berkeley had substantial commercial relations with Nigerian entities (including NNPC), which he failed to disclose.

4. In July 1999 an ex parte hearing for the arbitral proceeding was held with Petrec in attendance, but NNPC refused to attend. The arbitral panel accepted jurisdiction over the matter and held that Petrec had standing to bring its claims. In August 1999, NNPC belatedly requested to participate in the hearings and in November 1999 a superfluous second hearing on jurisdiction was held in London. NNPC challenged the panel's jurisdiction in the arbitration, but, for a second time, the panel ruled that it had jurisdiction. In February 2000 a hearing on liability was held in London and not only did the panel confirm again that it had jurisdiction over the matter, and that Petrec had standing to bring its claims, but also that NNPC was liable for breach of the oil reclamation JVA, as per the Partial Award issued by the arbitral award on July 5, 2000.

5. In January 2001, the arbitral panel held a session in London, where the only question

ostensibly to be considered was the quantum of damages to be awarded Petrec under the JVA. It was at this session that Nigerian diplomatic officials (including Prince Bola Ajibola) and NNPC representatives, including Chief Sena Anthony (NNPC's General Counsel), and NNPC's counsel (John Bowman (not named as a Defendant in this Complaint) and Robert Clarke (who is))  made an appearance before the tribunal, in an effort to persuade the tribunal to reconsider its previous ruling on jurisdiction, or to award no damages to Petrec. And even though the hearing was supposed to be devoted strictly to damage quantum issues, a surprising amount of time was spent examining Petrec's corporate forms and deliberating whether Petrec had standing to bring the claims brought under the oil reclamation JVA.

6. On October 9, 2001, the panel issued a Final Award in which it dismissed all of Petrec's claims for lack of standing. This ruling was issued despite the fact that three previous rulings of the panel had confirmed the panel's jurisdiction and Petrec's standing to bring the matter. The October 9, 2001 Final Award was the first adverse ruling Petrec had received in the proceeding, and the first (and only) indication that the panel had had a change in view on the merits of Petrec's case against NNPC. Petrec later sought to challenge the Final Award in Swiss and United States proceedings, based on violations of public policy and misinterpretations of controlling law (especially Texas's corporation law), but to no avail.

7. In June 2004, nearly three years after the issuance of the panel's Final Award, Petrec officials received information that NNPC had authorized, in March 2002, a $25million bribe to be paid to the arbitrators in order to secure a satisfactory outcome of Petrec's oil reclamation JVA claims. According to a March 18, 2002, letter from NNPC General Counsel Sena Anthony to arbitrator Andrew Berkeley, of which Petrec officials received a copy which they later had

4

forensically authenticated, the bribe was to be paid through a series of intermediaries including Nigeria's High Commissioner to the United Kingdom, Prince Bola Ajibola, and (possibly) NNPC's counsel, Robert Clarke. This bribe was apparently authorized by NNPC's Group Managing Director at the time, Jackson Gaius-Obaseki. While the intent of the letter was that the proceeds of the bribe were to be shared among each of the arbitrators – Berkeley, Meakin and van Houtte – it is also possible that Berkeley retained the bulk of the proceeds.

8. Only after Petrec officials had forensically authenticated NNPC's March 18, 2002 letter, did they initiate an independent investigation to validate suspicions that NNPC had actually suborned the corruption of the arbitral tribunal established to decide its claims under the oil reclamation JVA. In the course of this investigation, additional documents and communications came to light, some generated by NNPC officials or intermediaries, others by the arbitrators concerned. These documents and communications paint a picture of a consistent pattern of unreported ex parte communications between the panel arbitrators and NNPC officials or counsel. Even more disturbingly, these materials indicate a pattern by which NNPC commonly engaged in bribery and corruption of other arbitral proceedings, either through the payment of outright bribes in specific cases or by offers of lucrative appointments as party-appointed arbitrators in other matters.

9. Plaintiffs bring this action to recover damages inflicted on it as a result of Defendants' conduct. These damages will exceed several hundreds of millions of dollars, reflecting not only the proceeds of an arbitral award that Petrec would have received if the arbitral tribunal had not been corrupted, but also the consequential damages resulting from the delay and denial of justice in this case. Plaintiffs have suffered various business damages as a consequence of Defendants'

deliberate conduct. These include reputational damage, loss of other business opportunities, and other quantifiable business losses. Plaintiffs also seek losses for mental anguish (under the applicable statutory remedies), the trebling of damages (under the applicable statutory remedies), and punitive damages, all as permitted by law.

10. Plaintiffs assert claims under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"), the Federal Arbitration Act, 9 U.S.C. § 1 et seq., the Texas Deceptive Trade Practices statute, Tex. Bus. & Comm. Code § 17.46 et seq., and Texas's common law fraud and civil conspiracy tort actions.

## PARTIES

11. Plaintiff Gulf Petro Trading Company, Inc., is a Texas Corporation maintaining its principal office and place of business in Dallas, Dallas County, Texas.

12. Plaintiff Petrec International, Inc. is a wholly owned division of Gulf Petro Trading Company, Inc.

13. Plaintiff James S. Faulk is an individual residing and doing business in Dallas, Dallas County, Texas. He is a principal of Gulf Petro Trading Company, Petrec International, Inc., and Petrec (Nigeria), Ltd.

14. Plaintiff James W. Faulk is an individual residing and doing business in Dallas, Dallas County, Texas. He is a principal of Gulf Petro Trading Company, Petrec International, Inc., and Petrec (Nigeria), Ltd.

15. Defendant Nigerian National Petroleum Corporation ("NNPC") is a company organized under the laws of the Federal Republic of Nigeria (hereinafter "Nigeria"). For

purposes of this litigation, it is an agency or instrumentality of the foreign sovereign of Nigeria, within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq. It is a separate legal corporation whose shares or other ownership interests are owned by the government of Nigeria. It maintains its principal office and place of business at Central District, Herbert Macaulay Way PMB 190, Garki, Abuja, Nigeria, where it may be served with process by serving any officer of the corporation. During the relevant periods encompassed by this litigation, NNPC transacted its affairs in this district.

16. Defendant Bola Ajibola, a natural person, is a Nigerian national. On information and belief he is domiciled in Nigeria and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Prince Bola Ajibola was Resident High Commissioner of Nigeria to the United Kingdom, and acted as NNPC's agent in that capacity.

17. Defendant Jackson Gaius-Obaseki, a natural person, is a Nigerian national. On information and belief he is domiciled in Nigeria and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Chief Gaius-Obaseki was NNPC's Group Managing Director. During the relevant periods encompassed by this litigation, Gaius-Obaseki and NNPC transacted their affairs in this district.

18. Defendant Sena Anthony, a natural person, is a Nigerian national. On information and belief she is domiciled in Nigeria and amenable to service there, or by virtue of her agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Chief Sena Anthony was NNPC's General Counsel. During the relevant periods encompassed

by this litigation, Sena Anthony and NNPC transacted their affairs in this district.

19. Defendant Andrew W.A. Berkeley, a natural person, is a United Kingdom national. On information and belief he is domiciled in the United Kingdom and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Andrew Berkeley served as a member of the arbitral tribunal which is the subject of the instant suit. During the relevant periods encompassed by this litigation, Andrew Berkeley transacted affairs in other U.S. federal districts, including the Southern and Northern Districts of Texas.

20. Defendant Ian Meakin, a natural person, on information and belief is a United Kingdom national. On information and belief he is domiciled in Switzerland and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Ian Meakin served as a member of the arbitral tribunal which is the subject of the instant suit. During the relevant periods encompassed by this litigation, Ian Meakin transacted affairs in other U.S. federal districts, including the Northern District of Texas.

21. Defendant Hans van Houtte, a natural person, on information and belief is a Belgian national. On information and belief he is domiciled in Belgium and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Professor Hans van Houtte served as president of the arbitral tribunal which is the subject of the instant suit. During the relevant periods encompassed by this litigation, Hans van Houtte transacted affairs in other U.S. federal districts, including the Northern District of Texas.

22. Defendant Robert Clarke, a natural person, on information and belief is a Nigerian citizen. On information and belief he is domiciled in Nigeria and amenable to service there, or by virtue of his agents and activities in other jurisdictions. During the relevant periods encompassed by this litigation, Robert Clarke served as counsel to NNPC in the arbitral proceeding which is the subject of the instant suit. At these relevant times he was a partner of the Lagos office of Clarke, Paiko & Egwuenu. During the relevant periods encompassed by this litigation, Robert Clarke transacted affairs in other U.S. federal districts, including the Eastern and Northern Districts of Texas.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over this action on numerous grounds:

a. Pursuant to 28 U.S.C. §§ 1332(a)(2), (a)(3) & (a)(4), insofar as Plaintiffs are citizens of Texas, and Defendants are citizens or nationals of foreign States or of other jurisdictions in the United States, there is complete diversity and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs;

b. Pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330 & 1602 et seq., insofar as Defendant Nigerian National Petroleum Company ("NNPC") is an agency or instrumentality of a foreign sovereign. NNPC is not immune from the jurisdiction of this Court, under the FSIA, for the following reasons:

i. NNPC is a corporation owned by the government of Nigeria which is engaged in commercial activities carried on in the United States or causing a direct effect in the United States, within the meaning of 28 U.S.C. §§ 1603 and 1605(a)(2);

9

ii. NNPC is not immune insofar as a claim is brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. to vacate an arbitral award, an allowed exception under FSIA section 1605(a)(6);

c. Pursuant to 28 U.S.C. §§ 1331 & 1367(a), and 18 U.S.C. §§ 1964(a) & (c) & 1965, in that the civil RICO claims herein presented arise under the laws of the United States, and the state-law claims are so related to the RICO claims they form part of the same case or controversy;

d. Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202, for declaratory relief to vacate an arbitral award "procured by corruption, fraud or undue means. . . ."

24. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) & (d) (general provisions); 18 U.S.C. § 1965 (civil RICO); 28 U.S.C. § 1391(f) (for foreign sovereign agencies and instrumentalities); 9 U.S.C. § 204 (Federal Arbitration Act). There is no alternate or convenient forum in which Plaintiffs' civil claims against Defendants can be entertained.

## FACTUAL BASIS FOR CLAIMS

### The Negotiation of the Oil Reclamation MoU and JVA

25. In May 1992, James S. Faulk was invited to Nigeria to meet with Nigerian National Petroleum Corporation ("NNPC") officials, including Dr. Chu Okongwu, Minister of Petroleum and Dr. E.M. Daukoru, then Group Managing Director of NNPC, to evaluate potential investment opportunities in Nigeria's oil sector. In September 1992, Faulk returned to Nigeria to

tour three oil refineries with NNPC personnel. In December 1992, Faulk again returned to Nigeria and executed two agreements with NNPC on December 17, 1992. The first was a Joint Venture Agreement (JVA) concerning petroleum refining, which has no further relevance to this litigation, except to the extent indicated below. The second instrument was a Memorandum of Understanding (MoU) concerning oil reclamation activities, concluded between NNPC and Gulf Petro Trading Company, doing business as its division Petrec, International ("Petrec"). The purpose of the oil reclamation project was to reclaim or revitalize virtually any waste or slop oil, particularly at NNPC refineries, pipelines and other facilities. Not only would such oil reclamation be beneficial to the Nigerian environment, but would also be financially remunerative in the recovery of petroleum resources that would otherwise be lost. The oil reclamation projects were to be carried out with Petrec's proprietary technologies and techniques, developed over years of industry experience. A true and correct copy of the December 17, 1992 MoU is attached hereto as Exhibit "A" for all purposes and incorporated herein by reference.

26. In the spring of 1993, especially February 1993, Petrec acted in compliance with the December 17, 1992 MoU and purchased chemicals and trucks for the start-up of the oil reclamation project, in the amount of $3.9 million. Also during this period, negotiations also began for the conclusion of a Joint Venture Agreement (JVA) to replace the December 17, 1992 MoU. As part of NNPC's negotiation of the JVA, it engaged in due diligence and investigations of Petrec. This included NNPC's review of Petrec's audited and certified financial statements, its fundamental corporate documents, and other materials. Part of this review process took place in this district and in the Northern District of Texas. During the entirety of this period, NNPC

maintained an agent and transacted its affairs in this District.

27. On June 10, 1993, Petrec executed a Joint Venture Agreement (JVA) to replace the reclamation MoU of December 17, 1992. A true and correct copy of the June 10, 1993 JVA is attached hereto as Exhibit "B" for all purposes and incorporated herein by reference. As a consequence of concluding the oil reclamation JVA, Petrec had formed a Nigerian subsidiary, Petrec (Nigeria), Ltd. ("PNL") on July 22, 1993. As part of the oil reclamation JVA, NNPC was to provide 25% of the start-up capital, or $650,000, of the joint venture. Petrec was to provide 75%, or $1.95 million, which it did in contributions of equipment and proprietary technology. On September 7, 1993, Petrec concluded with NNPC a JVA to construct and operate a urea fertilizer plant in the natural gas sector of Nigeria. This Urea Fertilizer Plant JVA has no further relevance to this litigation, except to the extent indicated below.

28. On October 9, 1993, NNPC dispatched a team of three employees (Mr. A.B. Solarin, General Manger for Corporate Audit of NNPC, one employee from the corporate planning and development division, and one from their refining division) to visit and investigate Petrec offices in Dallas, Texas, as well as facilities located in this District. The purpose of the visit was to confirm the existence of the trucks and chemicals purchased by Perec for the oil reclamation JVA. On October 15, 1993, NNPC's investigatory team filed a report confirming that Petrec had made the required expenditures under the JVA, and that NNPC's obligations and operations under the reclamation project should begin forthwith. In particular, NNPC was obliged to make an initial contribution in capital to the joint venture (in the amount of $650,000) and other payments to PNL and Petrec, at bank accounts situated in the United States, in view of Petrec's substantial expenditures. The October 15, 1993 report also indicated that NNPC had nearly 3

million barrels of slop oil on hand at its refineries and that operations under the NNPC/Petrec oil

reclamation JVA were required in order to protect Nigeria's environment, and that the joint

venture would be quite profitable for both sides. A true and correct copy of the October 15, 1993

NNPC Due Diligence Report is attached hereto as Exhibit "C" for all purposes and incorporated

herein by reference. In anticipation of NNPC performing its initial obligations under the JVA

(including contributing the start-up capital of $650,000), Petrec had equipment moved to ports

located in this District and the Southern District of Texas, in order to be trans-shipped to Nigeria

to initiate the oil reclamation project.

### NNPC's Breach of the JVA and the Initiation of Arbitration

29. Pursuant to the oil reclamation MoU and JVA, NNPC was supposed to have made its

initial contribution of capital to the joint venture of $650,000 by January 1993. NNPC sought to

delay this payment until it had conducted due diligence on the nature and extent of Petrec's

contributions and expenditures. This due diligence was completed in October 1993, and the

October 15, 1993 NNPC Due Diligence Report certified that Petrec had made the appropriate

contributions to capital to the joint venture. NNPC's initial contribution to capital to the joint

venture, in the form of a remittance to Petrec's bank accounts in the United States, was thus due

in October 1993.

30. Beginning in the fall of 1993, quarterly board meetings of Petrec (Nigeria), Ltd.

("PNL") occurred. According to the JVA, three PNL directors were appointed by Petrec, and

two by NNPC. At these meetings, Petrec's appointed directors requested that NNPC make its

initial contribution to capital payment of $650,000. This was consistently refused by NNPC,

13

which, instead, demanded that Petrec perform ever more trivial and irrelevant tasks in order

secure the payment it was otherwise fully entitled to under the JVA. Among these spurious

requirements was for Petrec to provide an operations manual and then an employee training

manual and, finally, an employee benefits manual. None of these requirements was necessary, or

required under the JVA, since all training was supposed to have been accomplished on the job by

Petrec engineers and by employees assigned by NNPC at its wastewater and slop facilities at

each refinery. NNPC continued to make spurious demands, and not to perform any of its duties

under the JVA, for nearly 3 years. In 1994, Petrec even offered to forgive NNPC's $650,000

initial contribution to capital, in exchange for Petrec accepting increased profits from the oil

reclamation operation, once commenced. But NNPC refused even this offer, and refused to

permit Petrec to commence its performance under the JVA. Essentially, NNPC disavowed the

entirety of the oil reclamation project.

   31. On November 2, 1994, Mr. James S. Faulk was contacted by Mr. A.B. Solarin,

General Manager for Corporate Audit of NNPC. Mr. Solarin was, on that date, located in

Beaumont, Texas, conducting an audit of crude oil produced in Nigeria and imported into the

United States through the joint venture between Mobil Oil Company and NNPC. Solarin

indicated to Faulk that he traveled each year to Beaumont and Port Arthur, Texas, in order to

conduct audits on such joint ventures as NNPC's with Mobil Oil Company, now Exxon/Mobil

Corporation. On November 3, 1994, Mr. Faulk met with Mr. Solarin in Port Arthur, Texas,

concerning NNPC's failure to pay the initial capital contribution of $650,000. At that meeting.

Mr. Solarin confirmed that he had certified to NNPC that Petrec was in full compliance with the

oil reclamation JVA, and had recommended that NNPC pay the initial capital contribution

14

forthwith.

32. On information and belief, NNPC reneged on the oil reclamation JVA because performance under the joint venture would have brought to light wide-scale theft of Nigerian crude oil and natural gas resources by NNPC insiders. The avoidance of such wastage was the *raison d'etre* of Petrec (Nigeria), Ltd.'s oil reclamation project. Petrec's appointment of Chief Lawrence Onwujufu as PNL's Group Managing Director sent a powerful message to NNPC insiders. Trained as a certified public accountant (CPA), Chief Onwujufu had acquired a deserved reputation for financial rectitude and anti-corruption efforts over years of activities in Nigeria and NNPC's leadership was apparently fearful that, by virtue of his position with PNL, he would expose the failings and weaknesses of NNPC's oil recovery operations. It thus became imperative for NNPC to sabotage and stop Petrec's oil reclamation activities, and to breach the JVA.

33. Defendant NNPC and its principals (including Defendant Chief Gaius-Obaseki, who had become NNPC Group Managing Director and Defendant Chief Sena Anthony, NNPC General Counsel during the period covered by this Complaint) thus foresaw, planned and intended financial injury to Plaintiffs. They foresaw that breaching the June 10, 1993 oil reclamation JVA would cause substantial financial injury to Plaintiffs, not only insofar as Petrec had already expended over $4 million in supplies and equipment in furtherance of its obligations under the JVA, but also that Petrec, by virtue of NNPC's conduct, would be denied access to Nigeria's lucrative waste oil reclamation sector. NNPC's breach of the JVA also resulted in distortions in the oil market in Nigeria, the United States, and the world.

34. The June 10, 1993 oil reclamation JVA was supposed to be perpetual in duration, but

contained a provision (article 16, paragraph 1) which mandated a review of the JVA's terms and conditions at the end of the first five years of the agreement. As already narrated, after years of fruitless negotiations with NNPC and countless inconclusive PNL board meetings, with NNPC refusing to make any performance under the JVA, Petrec (through its counsel) informed NNPC that it was in breach of June 10, 1993 oil reclamation JVA. Additionally, Petrec invoked, as per article 18 of the JVA, that the dispute be submitted to international commercial arbitration. NNPC did not respond to Petrec's official notification of breach. According to article 19 of the JVA, the agreement was to be governed by Nigerian law and international law, where applicable, while the arbitral procedure would be governed by Swiss law.

35. In October 1998, Petrec filed an application of arbitration with the Chamber of Commerce and Industry in Geneva, Switzerland (hereinafter "CCIG"). NNPC again was notified, but did not respond. Petrec paid an initial filing fee of $10,000 to initiate the arbitral procedure. In November 1998, CCIG accepted jurisdiction over the arbitration and informed NNPC of its decision. NNPC did not reply. Petrec was compelled to pay NNPC's part of the full arbitration fees (another $70,000) in order to move the arbitration forward.

36. Under normal conditions (wherein both parties agree to arbitrate), each party nominates an arbitrator and submits his or her name to the CCIG and to the opposing party. If there is no challenge from the CCIG or opposing party then that party-appointed arbitrator is confirmed. The two confirmed arbitrators then choose the third arbitrator, who acts as chair or president, and who goes through the same procedure for final confirmation by CCIG. Prior to confirmation, each arbitrator must sign an affidavit affirming his or her impartiality, independence and non-conflicting interests. Arbitrators are informed that they have an on-going

16

duty to disclose to the parties and to CCIG any circumstances, including ex parte communications, which may give arise to either the reality or appearance that the arbitrator is no longer impartial, independent and non-conflicted.    37.  On January 13, 1999, Petrec apprised CCIG and NNPC of its selection or Mr. Andrew Berkeley, an English barrister, as Petrec's choice for its party-appointed arbitrator in the oil reclamation arbitration.  Berkeley, although nominated by Petrec as its arbitrator in the oil reclamation claim, was unknown to either Petrec or its counsel; he was selected from a list of candidates put forward by the Chartered Institute of Arbitrators in London.  On February 3, 1999, Mr. Berkeley confirmed in an affidavit to CCIG that he fulfilled the neutrality and conflict of interest requirements of Articles 10 and 34 of the CCIG Rules of Procedure.  In his affidavit, Berkeley certified that "I am and shall remain independent of the parties and I shall disclose immediately any circumstances likely to affect my independence in respect to the parties or any one of them." On March 16, 1999, CCIG confirmed Berkeley's appointment and appointed Mr. Ian Meakin, a British attorney based in Switzerland as the absent NNPC's ex parte choice.  The two party-appointed arbitrators then appointed Professor Hans van Houtte of Belgium as chairman of the tribunal.  Mr. Meakin and Professor van Houtte filed the same CCIG impartiality certification as Mr. Berkeley did, recognizing their continuing obligation to inform CCIG and the parties of any circumstances that would cast doubt on their impartiality.  A true and correct copy of the CCIG arbitrator impartiality forms and the responses by the arbitrators in this case is attached hereto as Exhibit "D" for all purposes and incorporated herein by reference.

### The Arbitral Proceedings

38. Petrec's oil reclamation arbitration unfolded in a series of phases and hearings. The panel initially determined that there would be a hearing and decision on jurisdiction, followed (if necessary) by a hearing and decision on NNPC's liability, followed (if necessary) by a hearing on the quantum of damages to be paid by NNPC to Petrec.

39. The hearing on jurisdiction was held on July 27, 1999, in Geneva, attended by Petrec's principals and counsel. NNPC's principals and counsel did not attend. At the hearing, the panel formally accepted jurisdiction over the case. In the meantime, Petrec had submitted its memorials and evidence in support of both its liability claim and damages.

40. In August 1999, after getting word of the CCIG panel's acceptance of jurisdiction, NNPC belatedly sought to participate in the hearings. Petrec acquiesced to this request, despite the prejudice it had suffered from NNPC's previous refusal to participate. On November 17, 1999, the panel held a superfluous second hearing on jurisdiction, this time with NNPC counsel present, in London. Within a few weeks, the arbitral panel issued a renewed ruling accepting jurisdiction over the case and rejecting NNPC's arguments to thwart prosecution of the case. A true and correct copy of this Order is attached hereto as Exhibit "E" for all purposes and incorporated herein by reference. NNPC subsequently responded to Petrec's liability filings.

41. From February 8-10, 2000, a hearing on NNPC's liability to Petrec under the oil reclamation JVA was held in London. On July 5, 2000, the panel issued a Partial Award in favor of Petrec on the liability issues. A true and correct copy of the July 5, 2000, Partial Award is attached hereto as Exhibit "F" for all purposes and incorporated herein by reference. The primary holdings of the July 5, 2000, Partial Award are as follows:

a. Petrec had *locus standi* (standing) to submit its claims under the June 10, 1993 JVA;

b. Petrec's claims were not barred based on the absence of business plans, government permissions or other preparatory work ostensibly required by NNPC, but not required in the JVA; and

c. NNPC did not fulfill its obligation to pay PNL and Petrec the $650,000 initial capital contribution for the joint venture.

The Partial Award ended with the ruling that "[t]he Arbitral Tribunal will rule on the question of quantum and all other prayers for relief at a later date," indicating that the only matter left for the Tribunal to deal with after the Partial Award, was the assessment of damages in favor of Petrec.

42. After Petrec had received the ruling on standing and liability in the Partial Award, the parties were required to submit filings on the quantum of damages that were owed by NNPC to Petrec. The hearing on the quantum of damages owed to Petrec under the oil reclamation JVA occurred in London from January 23-28, 2001. For the first four days, the quantum hearing proceeded as might be expected: evidence and testimony was received as to Petrec's expenditures under the JVA, its likely profits under the JVA, and other aspects of the global oil reclamation business and markets. But, then, on the fifth day of the quantum hearing, curious events transpired.

43. The arbitral panel allowed NNPC's counsel, including Robert Clarke, to make a renewed challenge to the tribunal's jurisdictional and to Petrec's standing to bring its claim. This was despite the fact that the tribunal had thrice before ruled that it had jurisdiction and that Petrec had standing. The purported basis of NNPC's renewed challenge was Gulf Petro Trading

Company's February 26, 2000, decision to formally incorporate its operating division of Petrec International, Inc. as a wholly-owned subsidiary of Gulf Petro. When NNPC sought to renew this challenge, Petrec's counsel informed the tribunal that for it to entertain a renewed jurisdictional or standing challenge, after the issuance of a Partial Award, would violate article 186 of Switzerland's Private International Law Code, which was the governing procedural law of the case.

44. Also occurring on the fifth day of the quantum hearing, January 27, 2001, the arbitral proceeding was visited by Bola Ajibola, who was then serving as Nigeria's High Commissioner to the United Kingdom. Ajibola had no ostensible reason for appearing before the tribunal; he was neither designated as a counsel, agent, principal or witness of NNPC. NNPC counsel, Robert Clarke, formally introduced Commissioner Ajibola before the tribunal. The arbitral proceedings were interrupted in order for the arbitrators to formally greet High Commissioner Ajibola. Defendant Andrew Berkeley stood-up and publicly embraced Defendant Bola Ajibola at this open hearing of the tribunal.

45. On the fifth and sixth days of the quantum hearing, the tribunal reserved the question of NPPC's renewed jurisdictional and standing challenge, and ordered the parties to brief the issue. On July 6, 2001, NNPC's Texas counsel, John Bowman, submitted a brief to the tribunal on the applicability of Texas law to Petrec's legal status. Petrec's counsel submitted a brief arguing that under Texas law, Petrec International was a lawful subsidiary or operating division of Gulf Petro Trading Company.

46. On July 16, 2001, a third hearing on jurisdiction and standing was held in London. While this hearing was ostensibly supposed to be limited to the question of Petrec International,

Inc.'s right to bring a case on its own behalf, separate and apart from its wholly-owned parent, Gulf Petro Trading Company, the testimony elicited by the Tribunal appeared instead designed to impugn the reputation of one of Petrec's principals, James S. Faulk. At one point in the proceedings, arbitrator Berkeley referred to Faulk as "the puppet master behind the various companies," a disparaging reference to the common practice in the oil industry of tiering operating entities and divisions. Petrec's attempts to introduce controlling Texas law authority as to the status of Petrec's operating entities were denied by the tribunal.

47. On October 9, 2001, the arbitral tribunal issued a Final Award in regard to Petrec's oil reclamation JVA with NNPC. A true and correct copy of the October 9, 2001, Final Award is attached hereto as Exhibit "G" for all purposes and incorporated herein by reference. The tribunal ruled that, despite its earlier holdings, including the Partial Award, that Petrec International, Inc. did not exist as a legal entity, and that it had no standing to bring a claim under the JVA. Also, the tribunal ruled that Petrec International, Inc. was not an alter-ego or an operating division of Gulf Petro Trading Company. The issuance by the arbitral tribunal of the Final Award on October 9, 2001, was the earliest possible date that the Plaintiffs could have discovered the injury they had received from Defendants' conduct.

48. On November 9, 2001, Petrec challenged the propriety of the arbitral Tribunal's Final Award in Swiss courts, strictly on grounds of the violation of Swiss arbitral procedure, Swiss public policy, and Switzerland's Private International Law statute. Petrec specifically reserved, in this proceeding, any challenge based on either Nigerian or Texas law. On April 3, 2002, the Swiss Federal Court ruled that there had been no violation of Swiss law.

49. On February 26, 2003, Petrec filed a complaint for declaratory relief, seeking to have

21

a U.S. federal district court rule that the Final Award violated Nigerian and Texas substantive law.  See *Gulf Petro Trading Co., Inc., et al v. Nigerian National Petroleum Company* (N.D. Tex. 03CV0406-G).  The district court ruled that it did not have subject matter jurisdiction to set aside or modify a final arbitral award and that the res judicata doctrine and international comity precluded the court from setting aside or modifying a final arbitral award, at least on substantive grounds.  See *Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Co.*, 288 F.Supp.2d 783 (N.D. Tex. 2003).  The district court's ruling on jurisdiction was affirmed on appeal.  See 115 Fed. Appx. 201 (5th Cir. 2004).

50.  At the time it brought both the Swiss and Texas challenges of the arbitral panel's Final Award, Petrec had no evidence in its possession of any possible corruption or bribery of the tribunal by NNPC.  Neither the Swiss or Texas challenge of the Final Award considered or addressed any possible claim by Petrec that the Final Award had been procured by NNPC by fraudulent or corrupt means.

## Evidence of the Corruption of the Arbitral Tribunal

51.  Within the strictures of Fed. R. Civ. P. 9(b), and based on information and belief, Plaintiffs make, in this section of the factual basis of their claims, the following allegations concerning Defendants' fraudulent or corrupt conduct.

52.  As already narrated, CCIG arbitrators, once they were confirmed, certify to their impartiality and neutrality as arbitrators, and were under a continuing obligation to report to the parties, and to CCIG, any events or occurrences (including ex parte communications with one of the parties) that might cast doubt on their certification.  At least two of the arbitrators in this case

failed repeatedly to make the required disclosures of information, that might have led a
reasonable party to question their impartiality or neutrality.

53.  Even prior to making his certification, Defendant Andrew Berkeley had substantial,
and unreported, contacts with NNPC and its officials.  In one earlier arbitral matter, initiated in
June of 1998, Berkeley was chosen to serve on a London Court of International Arbitration
matter.  With him on that tribunal were Richard Akinjide, Nigeria's then Minister of Justice, and
Defendant Bola Ajibola, who later became Nigeria's High Commissioner to the United
Kingdom.  These contacts were never disclosed either to CCIG or the parties.

54.  Defendant Andrew Berkeley failed to disclose a business trip he conducted to
Nigeria from approximately July 14 to July 20, 1999.  This trip was one week before the first
Petrec/NNPC arbitration hearing on July 27, 1999, in Geneva.  During this trip he held
discussions with NNPC officials, including Defendants Sena Anthony and Gaius-Obaseki
concerning the pending arbitration in Petrec's oil reclamation case.

55.  Defendant Andrew Berkeley failed to disclose a number of ex parte internet and
telephone communications he had with NNPC officials, including Defendant Sena Anthony and
NNPC's counsel, including John Miles (an attorney with the London offices of Mayer, Brown,
Rowe & Maw, LLP, and subsequently with the London office off Hunton & Williams),
Defendant Robert Clarke, and John Bowman (an attorney with the firm of Fulbright & Jaworski).
These communications transpired after the tribunal first ruled it had jurisdiction over Petrec's
complaint under the oil reclamation JVA, in July 1999 and NNPC's subsequent request to
participate in the case in August 1999.  The content of these communications concerned NNPC's
legal strategy not only in the Petrec oil reclamation JVA case but also Petrec's oil refinery and

urea fertilizer JVAs and their respective arbitral proceedings.

56. As recently as 2003, Defendant Andrew Berkeley has accepted appointments by NNPC as its party-appointed arbitrator in at least two proceedings, including an arbitral proceeding in a matter involving another Petrec operating division, Gulf-Petrochem, and NNPC involving the urea fertilizer plant JVA. These contacts were never disclosed either to CCIG or the parties, as part of an on-going obligation to report actual or potential conflicts of interest to an arbitral body.

57. Defendant Ian Meakin was associated from 1992 to 1996 with the Swiss law firm of Lalive, Buden & Partners. Lalive, Buden & Partners represented NNPC in many matters during the period in which Meakin was associated with the firm. Defendant Ian Meakin failed to disclose these contacts when he made the requisite certification in the arbitral proceeding. Lalive, Buden & Partners represented NNPC in Petrec's challenge of the Final Award before the Swiss courts. Lalive, Buden & Partners continues to represent NNPC in a variety of proceedings.

58. Defendant Andrew Berkeley has had an ongoing relationship with Lalive, Buden & Partners, since as early as 1997, and has been involved in advising and representing NNPC in a number of matters. These contacts were never disclosed either to CCIG or the parties.

59. Defendant Andrew Berkeley also has an ongoing relationship with the Texas law firm of Fulbright & Jaworski, where John Bowman is a partner. Fulbright & Jaworski and John Bowman has represented NNPC in both the arbitral proceedings recounted in this Complaint, as well as Petrec's U.S. domestic challenge of the tribunal's Final Award. These contacts were never disclosed either to CCIG or the parties.

60. In a letter dated March 18, 2002, from Defendant Sena Anthony, NNPC General Counsel, and hand-delivered to Defendant Andrew Berkeley, the scheme to corrupt the arbitral trbunal concerning Petrec's claims under the oil reclamation JVA, are fully revealed. A true and correct copy of the March 18, 2002, NNPC Letter is attached hereto as Exhibit "H" for all purposes and incorporated herein by reference. Petrec acquired a copy of this document from an NNPC whistle-blower on September 24, 2004. That date was the earliest date that Petrec had any authoritative evidence that the arbitral tribunal which had heard its case had been suborned by fraud, bribery and corruption. Petrec promptly sought to authenticate the March 18, 2002 letter using forensic techniques available to it. The letter is on NNPC letterhead, bears a reference as "REF:NNPC/PII/S035". In the upper-right hand corner, the letter indicates that it was hand-delivered to its addressee, Defendant Andrew Berkeley. The letter bears the signature of Defendant Sena Anthony, NNPC General Counsel, although her given title in the letter is as "Group General Manager, Corporate Secretariat & Legal Division/Secretary to the Corporation". A true and correct copy of the forensic authentication of the March 18, 2002, NNPC Letter is attached hereto as Exhibit "I" for all purposes and incorporated herein by reference.

61. The March 18, 2002, NNPC Letter largely speaks for itself as evidence that NNPC paid a $25million bribe to Andrew Berkeley and his colleagues in order to procure a favorable outcome in Petrec's oil reclamation JVA case. Obviously, however, such a letter is written in somewhat elliptical terms. But it is clear that it involves Petrec International, as the subject line and the language of paragraphs 3 and 4 so indicate. The abbreviation "GMD," as used in the letter refers to NNPC's Group Managing Director, who at that time was Defendant Gaius-Obaseki. The letter also indicates that the $25 million bribe was to be remitted to Defendant

Andrew Berkeley, through a "mutually designated stakeholder." Given the reference in paragraph 2, that stakeholder is believed to be Defendant Bola Ajibola, who probably retained a portion of the $25 million for his own personal account.

62. One ambiguity in the March 18, 2002, NNPC letter is whether Defendant Andrew Berkeley received the remainder of the $25million bribe (after "stakeholder" Defendant Bola Ajibola's share was calculated), or whether the bribe was shared with Berkeley's co-arbitrators Ian Meakin and Hans van Houtte. The clear implication of the letter was that Defendants Meakin and van Houtte were supposed to receive "their own portions." Indeed, in an abundance of accounting caution, Defendant Sena Anthony required that an "agent we mutually agreed upon for this purpose" actually certify that Meakin and van Houtte had received their share. The letter is ambiguous as to the identity of that agent, but it apparently was not Defendant Bola Ajibola, and is believed to be instead either John Miles (who is mentioned in the letter's last paragraph) or Defendant Robert Clarke.

63. According to the March 18, 2002, NNPC Letter a $25million bribe was transmitted from Defendant NNPC, through Defendant Bola Ajibola, and thence to Defendant Andrew Berkeley, in order to procure a favorable result in the arbitration involving Petrec's oil reclamation JVA claims. According to the terms of the March 18, 2002, NNPC letter the bribe had been transmitted through these channels sometime before March 18, 2002.

64. The March 18, 2002, NNPC letter also indicates that the corrupt activities perpetrated by NNPC were intended as on-going. The letter states: "This letter confirms our understanding with you that the above amount covers your task of piloting and shadowing the whole three cases connected with James Faulk and his companies as they progress with their

26

suits against NNPC so that if possible the outstanding two do not take off at all." Clear reference

is being made to Petrec's two other JVAs with NNPC, including the oil refinery JVA and urea

fertilizer plant JVA. Defendant Berkeley had been appointed, by NNPC counsel John Miles, as

NNPC's party-appointed arbitrator in at least one of these proceedings (concerning the urea

fertilizer plant JVA). At the current time, both arbitrations have been placed in abeyance. It

nonetheless appears that NNPC has tasked Defendant Berkeley to procure favorable results for

NNPC in those future arbitrations, as well. Indeed, the letter indicates that NNPC "was gratified

that as you said, you could from now act as our arbitrator in the remaining two cases and that you

foresee no problem in this regard." As part of this ongoing scheme, Defendant Berkeley is

charged in the letter to liaise with NNPC attorney John Miles, who would "do as you wish" and

"co-operate with you fully." To the extent that the letter references other NNPC attorneys "in

the UK and US," it is also believed that Defendant Robert Clarke and John Bowman were part of

this on-going conspiracy to suborn the corruption of subsequent arbitral tribunals involving

Petrec and NNPC.

65. In February 2005, Petrec officials acquired a communication dated October 31, 2003,

from Defendant Sena Anthony to a Mr. Paul Nomayo, then resident in London, with instructions

to relay the message verbally (by telephone) to Defendant Gaius-Obaseki, who was then staying

at an unspecified London hotel. A true and correct copy of the October 31, 2003, NNPC

Communication is attached hereto as Exhibit "J" for all purposes and incorporated herein by

reference. As with the March 18, 2002, NNPC letter, this communication was subject to

searching forensic authentication by a handwriting and document authenticator approved by the

English Law Society. A true and correct copy of the February 27, 2005, authentication of the

October 31, 2003, NNPC Communication is attached hereto as Exhibit "K" for all purposes and incorporated herein by reference.

66. The October 31, 2003, NNPC Communication was ostensibly intended as a way for Defendant Sena Anthony (acting as NNPC General Counsel) to apprise Defendant Gaius-Obaseki (then NNPC General Managing Director) that Obaseki was about to be dismissed from his position for corruption. According to paragraph 2 of the communication, Obaseki's office had already been sealed and his replacement selected, presumably by the then-newly-elected President of Nigeria. Of relevance to this litigation is the communication's statement, in paragraph 2, that "The most important thing now is to tell Mr Berkeley not to proceed to Nigeria. Get him on the phone please. Prince Ajibola has been making frantic efforts to get him since yesterday, but without success." Somewhat more elliptically, paragraph 3 of the communication says that "Both you and Mr Berkeley should discard all documents relating to the £25m Petrec operations which you collected for your records. At any rate, do not return with any sensitive document, especially those relating to NLNG projects at least for now." This statement confirms a $25 million bribe was made in the Petrec case to Defendant Berkeley, although the writer mistakenly renders the amount in pounds sterling. It also confirms that Defendants Sena Anthony, Gaius-Obaseki, and Bola Ajibola were aware of this corrupt scheme, and took efforts to "discard" and destroy all documents relating to this affair.

67. The October 31, 2003, NNPC Communication mention of documents relating to "NLNG projects" is significant. As narrated above, it had long been suspected that NNPC top officials had been involved in the deliberate understatement of Nigeria's oil and liquefied natural gas (NLNG) resources, in order that portions of those resources could be diverted to the private

use and benefit of those officials.  Defendant  Gaius-Obaseki was, in fact, subsequently removed

as NNPC Group Managing Director on suspicion of corruption.

## CLAIMS FOR RELIEF

### Count I
### Racketeer Influenced and Corrupt Organizations (Civil RICO)
### Monetary Damages for Participation in a Corrupt Organization - 18 U.S.C. § 1962(c)
### (Applicable to All Defendants)

68.  Plaintiffs repeat each of the allegations contained in paragraphs 1 through 67 as fully

set forth herein.

69.  This count is a civil action brought by the Plaintiffs under the Organized Crime

Control Act of 1970, Racketeer Influenced and Corrupt Organizations, 18 U.S.C. § 1961 et seq.,

more specifically for participation in a corrupt organization in violation of 18 U.S.C. § 1962(c).

70.  Plaintiffs are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

71.  Each Defendant is a "person,"within the meaning of 18 U.S.C. §§ 1961(3), 1962(c)

and (d).

72.  Defendant NNPC is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and

1962(c).

73.  Each Defendant named in paragraphs 16-22 above was employed by, or was

associated with the enterprise, NNPC, engaged in and the activities of which affected interstate

or foreign commerce, within the meaning of 18 U.S.C. § 1962(c).  Each Defendant named in

paragraphs 19-22 is and was engaged in the practice of international commercial arbitration, the

activities of which affected interstate or foreign commerce within the meaning of 18 U.S.C. §

1962(c).

74.  Each Defendant named in paragraphs 15-22 above were an association in fact, sharing a common purpose, unity and identifiable structure in that the enterprise, NNPC, operated the business that allowed Defendants Obaseki, Anthony and Ajibola to suborn the corruption of international arbitral tribunals, including that involving Defendants Berkeley, Meakin, and van Houtte, in violation of the laws of the United States, Texas, and of other jurisdictions.

75.  Each Defendant named in paragraphs 16-22 above conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), on more than two occasions, including but not limited to the following offenses enumerated in 18 U.S.C. § 1961(1):

     a.  mail fraud, in violation of 18 U.S.C. § 1341;

     b.  wire fraud, in violation of 18 U.S.C. § 1353;

     c.  obstruction of justice, in violation of 18 U.S.C. § 1503(a);

     d.  traveling for racketeering activities, in violation of 18 U.S.C. § 1952;

     e.  monetary transactions in property derived from unlawful activity, in violation of 18 U.S.C. § 1957;

     f. commercial bribery, in violation of Tex. Penal Code Ann. § 32.43, as incorporated by 18 U.S.C. § 1961(1); and

     g.  bribery, in violation of Tex. Penal Code Ann. § 36.02, as incorporated by 18 U.S.C. § 1961(1).

76.  Within the strictures of Fed. R. Civ. P. 9(b), Plaintiffs make, on information and belief, the following allegations about Defendants' conduct in violation of the civil RICO statute,

particularly in relation to Defendants' violation of 18 U.S.C. § 1962(c):

      a.   Defendants, individually and collectively, participated in a scheme or artifice to defraud, and Defendants (and other persons associated with the scheme or artifice) used the mails or wire communication, or caused the mails or wire communications to be used, and that use of the mails or wire communications was for the purpose of executing the scheme.  Plaintiffs were a victim of this scheme to defraud, insofar as Defendants, individually and collectively, intended Plaintiffs to be harmed by their dishonest methods or schemes and by depriving Plaintiffs of property and contractual rights by the use of trick, deceit, chicanery or overreaching. Plaintiffs were actually deceived by Defendants' conduct, at least until it was discovered. Plaintiffs actually or reasonably relied on representations made by the Defendants, in different capacities and circumstances, that the arbitral panel hearing Petrec's oil reclamation JVA claims was neutral and disinterested, and not tainted by corruption and bribery;

      b.   Defendants, individually and collectively, obstructed justice by issuing communications that suborned the corruption of an international commercial arbitration tribunal, or otherwise sought to influence, obstruct or impede the due administration of justice through the international arbitral proceedings featured in this case.

      c.   Defendants, individually and collectively, engaged in travel in interstate or foreign commerce, with the intent to distribute the proceeds of unlawful activities, and to promote, manage, establish, carry-on, or facilitate the promotion, management, establishment or carrying-on of any unlawful activity.  For the purposes of any violation of 18 U.S.C. § 1952 (traveling for racketeering activities), a violation of 18 U.S.C. § 1957 (monetary transactions in property derived from unlawful activity) is subsumed.  Defendants Bola Ajibola, Robert Clarke,

and Gaius-Obaseki, Nigerian nationals, engaged in travel involving the knowing or attempted monetary transaction in criminally derived property in excess of $10,000, to the extent that it can be shown that any U.S. bank or financial institution was involved in the transfer, allocation or distribution of such funds.

      d. Defendants, individually or collectively, engaged in the act of commercial bribery, as proscribed by Texas law. Insofar as the arbitrators of a domestic or international commercial arbitration owe a fiduciary duty to the parties and to their sponsoring arbitral institution, to be and remain impartial and neutral during the course of arbitral proceedings, and not to accept bribes by one party to affect the outcome of the proceedings, and to generally remain uncorrupted, Defendants Andrew Berkeley, Ian Meakin, and Hans van Houtte violated such a duty by intentionally or knowingly accepting a benefit from another party with the understanding that the benefit will influence their conduct.

      e. Defendants, individually or collectively, engaged in the act of bribery, as proscribed by Texas law. Insofar as the arbitrators and parties (including principals and counsel of the parties) of a domestic or international commercial arbitration are required to respect the impartiality and neutrality of the arbitral tribunal, and not to solicit or accept a bribe by one party to affect the outcome of the proceedings, and to generally remain uncorrupted, all Defendants intentionally or knowingly solicited or accepted a benefit as a consideration for the arbitrator's decision in a legal proceeding.

77. Within the strictures of Fed. R. Civ. P. 9(b), Plaintiffs make, on information and belief, the following allegations about Defendants' conduct in violation of the civil RICO statute, particularly in relation to Defendants' violation of 18 U.S.C. § 1962(c):

a. Defendants, individually or collectively, have engaged in open-ended and on-going racketeering activities, insofar as (i) NNPC appears to be engaged in a consistent pattern and practice of suborning the corruption of international arbitral tribunals, before which it is appearing as a party, by bribing one or more arbitrators in order to obtain a favorable outcome in the arbitration, and (ii) more particularly, in this case, and as per the clear language of the March 18, 2002, NNPC Letter to Defendant Andrew Berkeley, that a bribe was being paid not only to influence the outcome of Petrec's arbitration in the oil reclamation JVA matter, but also for subsequent (and now pending) arbitrations concerning Petrec's oil refinery and urea fertilizer plant JVAs;

b. Defendants, individually or collectively, have engaged in a pattern of offenses and predicate acts that indicate a continuity of events leading to the injuries and damages sustained by the Plaintiffs. This pattern includes the following acts:

i. In relation to Defendants Andrew Berkeley, Ian Meakin, and Hans van Houtte, their failure – between January 1999 and the present – to disclose ex parte contacts with NNPC officials, principals, agents or counsel, especially those concerning the solicitation or acceptance of a bribe or other inducement that would affect the outcome of the arbitration, and their failure to disclose information that might cast doubt on their respective impartiality and neutrality in the arbitration, and their use of the mails or wire communications to manifest their continued impartiality and neutrality, when such was not the case, is a violation of 18 U.S.C. §§ 1341 & 1343; and Texas Penal Code Ann. § 32.43 (2005);

ii. In relation to all Defendants, their engaging in the use of the mails and wire communications to develop and perpetuate the fraudulent scheme to suborn the corruption

33

of the Petrec oil reclamation JVA arbitration through bribery, as well as to influence, obstruct, or impede the due administration of justice – as particularly manifested in the March 18, 2002, NNPC Letter and the October 31, 2003, NNPC Communication, as well as other communications and contacts referred to in these materials, and other communications not yet revealed – is a violation of 18 U.S.C. §§ 1341 & 1343; and 18 U.S.C. § 1503(a). Defendants, particularly Defendants Sena Anthony, Gaius-Obaseki, and Andrew Berkeley, also sought to conspire to cover-up their illegal activities and to destroy documents, as manifested in the instructions contained in the October 31, 2003, NNPC Communication;

iii.  In relation to Defendant Clarke, his engaging in domestic and foreign travel, on behalf of his client NNPC, and in support of his legal and international commercial arbitration practices, in order to engage in monetary transactions in excess $10,000, of proceeds derived from unlawful activities, is a violation of 18 U.S.C. §§ 1952 & 1957. On information and belief, Defendant Robert Clarke has received in excess of $10,000 in fees for legal services in relation to all Petrec matters involving NNPC.   In relation to Defendants Ajibola and Obaseki, their engaging in domestic and foreign travel, on behalf of their employer or principal, NNPC, in order to engage in monetary transactions in excess $10,000, of proceeds derived from unlawful activities, is a violation of 18 U.S.C. §§ 1952 & 1957, insofar as a United States bank or financial institution was involved in the transfer, allocation or distribution of such funds. According to the March 18, 2002, NNPC Letter, Defendant Ajibola was the intermediary by which the $25million bribe was transmitted to Defendant Andrew Berkeley and his fellow arbitrators on the panel. Given the reference in paragraph 2 of the March 18, 2002, NNPC Letter, Defendant Bola Ajibola probably retained a portion of the $25 million for his own personal

34

account. Defendant Ajibola traveled to London in order to make a visit to the arbitral tribunal at its sitting on January 27, 2001. Defendant Obaseki, according to the October 31, 2003, NNPC Communication, traveled to London and sometime on or before October 31 or November 1, 2003, sought to (or did) contact Defendant Andrew Berkeley, in pursuance of a cover-up of the fraudulent scheme to corrupt the Petrec oil reclamation JVA tribunal;

           iv. In relation to all Defendants, the actual offer or acceptance, solicitation or receipt, or aid or facilitation of the payment of a bribe, inducement, or benefit to influence the outcome of any legal proceeding, including an international commercial arbitration (whether or not the arbitrators are held to be in a fiduciary duty to the parties and appointing authority at least as to their continuing impartiality and neutrality in a particular matter) is a violation of 18 U.S.C. § 1503(a); Texas Penal Code § 32.43 (2005) and Texas Penal Code § 36.02 (2005). As indicated in the March 18, 2002, NNPC Letter a bribe was paid to Defendant Andrew Berkeley, thence to be transferred to his fellow arbitrators, Defendant Ian Meakin and Defendant Hans van Houtte. According to the March 18, 2002, NNPC Letter, Defendants Sena Anthony and Gaius-Obaseki actually authorized the payment of the bribe, and were knowledgeable about the payment of the bribe. According to the March 18, 2002, NNPC Letter, Defendant Bola Ajibola actually facilitated the transmission of the bribery proceeds to Defendant Andrew Berkeley. Also according to the March 18, 2002, NNPC Letter, NNPC's counsel, including John Miles and Defendant Robert Clarke assisted in the facilitation of the payment of the bribe, or in the subsequent coordination of activities with the corrupted arbitrators, or was at least knowledgeable about the payment of the bribe.

78. In accordance with the terms of 18 U.S.C. § 1962(c), Plaintiffs have, though this